*Northwell Health, Inc. v. Group Hospitalization and Medical Services, Inc.*

# United States Court of Appeals
# For the Second Circuit

---

August Term 2025

Argued: December 12, 2025

Decided: July 15, 2026

No. 25-192

---

NORTHWELL HEALTH, INC.,

*Plaintiff-Appellant*,

*v.*

GROUP HOSPITALIZATION AND MEDICAL
SERVICES, INC., CAREFIRST BLUECHOICE, INC.,
CAREFIRST OF MARYLAND, INC., CFA, LLC,

*Defendants-Appellees*,

CAREFIRST – BCBS NATIONAL CAPITAL AREA,

*Defendant.*

---

Appeal from the United States District Court
for the Eastern District of New York
No. 23-CV-1268, LaShann DeArcy Hall, *Judge.*

---

Before:    PARK, PÉREZ, and NATHAN, *Circuit Judges.*

Plaintiff, a New York healthcare provider, appeals from the dismissal of its complaint alleging underpayment of insurance claims by out-of-state Blue Cross Blue Shield insurers. Defendants have no direct contracts with Plaintiff and do not sell insurance in New York. However, they do maintain a business relationship with a Blue Cross Blue Shield insurer based in New York, and through that relationship they benefit from Plaintiff's contracts with that insurer. The district court concluded that this relationship was too attenuated either to confer personal jurisdiction or to support Plaintiff's claims on the merits.

We disagree. Defendants' purposeful dealings with a New York company and exploitation of New York's markets for health care and insurance satisfy the requirements of New York's long-arm statute and the Due Process clause. We also hold that Plaintiff has adequately stated a ratification-based theory of contract liability; that

its quasi-contract claims are not barred as duplicative; and that it has shown a sufficiently close connection to Defendants to support such quasi-contract claims. We agree, however, with the district court's dismissal of Plaintiff's third-party beneficiary claims. AFFIRMED IN PART, AND OTHERWISE REVERSED AND REMANDED.

————

JOHN R. HORVACK, JR., Meghan F. Buckley, Carmody Torrance Sandak & Hennessey LLP, New Haven, CT; Timothy F. Butler, Meredith F. McBride, David McCarthy, Butler Tibbetts, LLC, Southport, CT, *for Plaintiff-Appellant*.

MISHA TSEYTLIN, Kevin M. LeRoy, Troutman Pepper Locke LLP, Chicago, IL; Valerie Sirota, Troutman Pepper Locke LLP, New York, NY; Anais Jaccard, Troutman Pepper Locke LLP, Charlotte, NC, *for Defendants-Appellees*.

————

NATHAN, Circuit Judge:

Northwell Health is one of the largest healthcare providers in New York. For decades it has participated in the Blue Cross Blue Shield ("Blue Cross") insurance network. As a result, Northwell does not require patients with Blue Cross insurance to pay full price out of pocket. Instead, Northwell charges those patients preferential prices that it has negotiated with Blue Cross and sends their bills directly to Blue Cross for reimbursement. If Northwell thinks that Blue Cross

3

has underpaid on a claim, Northwell may appeal through a contractually defined dispute-resolution process. If that process fails, Northwell can sue for breach of contract, as it has done here.

The complication is that Blue Cross is not a single entity, but rather a network of thirty-four independent companies that license the Blue Cross name for use in distinct geographic areas. Northwell's contracts are with the New York licensee—Empire[1]—but its claims here are against the licensees operating in Washington, D.C., Maryland, and Virginia. While Defendants have long reimbursed Northwell on an in-network basis for care provided to their insureds, they have done so by routing payments through Empire, and based on the terms of Empire's contracts. They have no contracts of their own with Northwell.

Defendants argue that the indirect nature of their ties to Northwell and to New York defeats both personal jurisdiction and Northwell's claims on the merits. We disagree. Defendants have maintained a longstanding business relationship with Empire, a New York company, in order to obtain preferential prices in New York; have performed under Empire's contracts with Northwell; and provide insurance to numerous New York residents. That conduct satisfies the requirements of both New York's long-arm statute and the Due Process clause. For similar reasons, we hold that Northwell has adequately stated contract and quasi-contract claims based on Defendants' performance and acceptance of benefits under Northwell's contracts with Empire. We agree with the district court,

---

[1] Empire's full name is Empire Blue Cross and Blue Shield.

4

however, that Northwell failed to state third-party beneficiary claims, and that those claims were appropriately dismissed.

**BACKGROUND[2]**

Northwell Health operates hospitals and other healthcare facilities throughout New York.  Defendants are members of the Blue Cross and Blue Shield Association (BCBSA), "a national association of thirty-four independent, community-based and locally operated Blue Cross Blue Shield companies," each of which licenses from BCBSA the right to use its trademarks, names, and logos within certain geographic areas.  Joint App'x at 16.  Defendants operate in Washington, D.C.; Maryland; and parts of Virginia.  Empire is the BCBSA member operating in New York.

To obtain the right to market itself as a Blue Cross company, each licensee executes a "Member License Agreement" with BCBSA.  That agreement "recognizes the importance of a comprehensive national network of independent BCBSA licensees," and commits licensees to participate in the BlueCard Program, which "links participating healthcare providers and the independent Blue Cross Blue Shield companies across the country in a single electronic network for claims processing and reimbursement."  *Id.* at 16–18 (alteration omitted).  It also states that participation in the BlueCard Program serves the "purpose[] of providing portability of membership between the Plans and ease of claims processing for

---

[2] The following facts are drawn from Northwell's complaint and are assumed true for purposes of our review of the district court's dismissal order.  *See Ricci v. Teamsters Union Loc. 456*, 781 F.3d 25, 26 (2d Cir. 2015) (per curiam).

5

customers receiving benefits outside of the [signatory's] Service Area." *Id.* at 17.

The "participating healthcare providers" that compose Blue Cross's network "participate" by means of "provider agreements" with local Blue Cross licensees. *Id.* at 18–19. Northwell signed one such agreement with Empire in 2000 (the Provider Agreement).[3] The Agreement sets forth "medically necessary health care services" and the reimbursement rates to be paid for those services. *Id.* at 19. It also includes certain limitations, including a bar on downgrading or denying claims for medically necessary services.

Under the 2000 version of the Provider Agreement, Northwell agreed to accept patients subscribed to out-of-state Blue Cross plans and to apply the terms of the Provider Agreement to those patients. *Id.* at 20–21. However, despite agreeing to accept insurance underwritten by out-of-state Blue Cross licensees, Northwell agreed to submit claims to, and be reimbursed by, Empire alone. Indeed, Northwell agreed that Empire was solely responsible for making payments, and that no other person, entity, or organization would be liable for Empire's obligations under the Provider Agreement. The Provider Agreement also expressly stated that Empire was not an agent of BCBSA. Apparently, the parties performed without dispute under the 2000 Agreement for many years.

In 2008, Empire and Northwell executed an amendment to the

---

[3] The Provider Agreement comprises two contracts: (i) an HMO Agreement with Empire Blue Cross and Empire HMO, and their affiliates; and (ii) a PPO/Indemnity Agreement with Empire Blue Cross and Empire Assurance, and their affiliates.

Provider Agreement (the 2008 Amendment). That amendment for the first time defined "Payers" to include "any plans affiliated with the Blue Cross and Blue Shield Association[.]" *Id.* at 20. Such Payers "are bound by the applicable rates" and are "subject to all of the provisions of [the Provider Agreement] which apply to services rendered[.]" *Id.* at 49 (alteration adopted). Payers are also "entitled to access the services of [Northwell] Providers that participate in the Empire network." *Id.* at 20. Whereas the 2000 version of the Agreement made Empire legally responsible for payments, the 2008 Amendment stated that "Payers . . . are legally responsible for payment of Covered Services under the terms of the applicable benefit plan[.]" *Id.* Despite the express rights and obligations of Payers under the 2008 Amendment, no Payers other than Empire are party to it or to the original Provider Agreement.

Under the operative Provider Agreement, Northwell seeks reimbursement from Blue Cross as follows. First, Northwell submits statements to Empire, which identifies the correct out-of-state licensee (the Home Plan) and relays Northwell's charges in a standard format. The Home Plan—i.e., Defendants—then makes a claim determination, issues an explanation of benefits to the insured patient, and transmits payment to Empire. Finally, Empire forwards the explanation to Northwell and pays Northwell the amount approved by the Home Plan. Empire cannot pay Northwell until the Home Plan has authorized the payment and transmitted the necessary funds to Empire.

At issue here are services that Northwell provided to Defendants' insureds, many of whom are New York residents,

7

between 2019 and 2022. After rendering care, Northwell submitted its claims to Empire, which routed them to Defendants. Defendants determined that Northwell was entitled to only partial payment on those claims and Empire paid Northwell the partial amounts. According to Northwell, over $5.5 million remains outstanding.

After unsuccessfully appealing Defendants' claim determinations through the dispute resolution process specified in the Provider Agreement, Northwell filed this suit in Nassau County Supreme Court. Defendants removed to the Eastern District of New York, invoking diversity jurisdiction, and subsequently moved to dismiss. On December 24, 2024, the district court dismissed for both failure to state a claim and lack of personal jurisdiction. On January 14, 2025, the court denied Northwell's motion for reconsideration and its request to file a second amended complaint. Northwell timely appealed.

## STANDARD OF REVIEW

"We review a district court's grant of a motion to dismiss [under Rule 12(b)(6)] *de novo*, accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Cornelio v. Connecticut*, 32 F.4th 160, 168 (2d Cir. 2022) (quotation marks omitted). We likewise review *de novo* a dismissal pursuant to Rule 12(b)(2). *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008). For Rule 12(b)(2) purposes, we may consider materials outside the complaint, such as affidavits. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (per curiam). But where, as here, the district court did not conduct "a full-blown

8

evidentiary hearing, plaintiffs need only make a prima facie showing of personal jurisdiction over the defendant." *Porina*, 521 F.3d at 126 (quotation marks omitted).

## DISCUSSION

### I.  Subject Matter Jurisdiction

We must begin by assuring ourselves that we have subject matter jurisdiction. *Marquez v. Silver*, 96 F.4th 579, 582 (2d Cir. 2024). Defendants invoked diversity jurisdiction as the basis for removal, which "requires that all of the adverse parties in a suit be completely diverse with regard to citizenship." *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51 (2d Cir. 2000) (citation modified). However, one of the defendants—Group Hospitalization and Medical Services, Inc. (GHMSI)—is a federally chartered corporation.[4] Such an entity is "not a citizen of any state," and therefore its presence as a party generally defeats diversity jurisdiction. *See Bankers' Tr. Co. v. Tex. & Pac. Ry. Co.*, 241 U.S. 295, 309 (1916); *see also Schneiderman v. Am. Chem. Soc'y*, 172 F.4th 158, 191 (2d Cir. 2026) (holding that 28 U.S.C. § 1332(c)(1), which specifies the rules of corporate citizenship for diversity purposes, does not apply to federally chartered corporations).

Congress can, however, override this default rule, and has "enacted various statutes expressly identifying the federally

---

[4] Another defendant, CFA, LLC, is a limited liability company with GHMSI as one of its members, and therefore shares GHMSI's citizenship. *See Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012).

chartered corporations it wanted to treat as State citizens subject to diversity jurisdiction." *Schneiderman*, 172 F.4th at 180. "[S]uch statutory carveouts are one of two such exceptions to the general rule that federally chartered corporations may not be sued in diversity (the other exception being localization)." *Id.*[5]

We conclude that GHMSI's charter, which designates GHMSI's "legal domicile" to be Washington, D.C., is such a statutory carveout. As amended in 1993, the charter provides that "[t]he District of Columbia shall be the legal domicile of the corporation." District of Columbia Appropriation Act, 1994, Pub. L. 103-127, § 138, 107 Stat. 1336, 1349 (1993). "The domicile of a corporation," in turn, "is the state of its incorporation." *Corporate domicile*, BLACK'S LAW DICTIONARY (6th ed. 1990); *see also Domicile*, WEBSTER'S THIRD NEW INT'L DICTIONARY 671 (1993) (defining domicile for a corporation as its place of "creat[ion]" or "incorporat[ion]"); *Corporate domicil*, BALLENTINE'S LAW DICTIONARY 273 (3d ed. 1969) ("A corporation is domiciled . . . in the state of its creation[.]"); *Domicil*, BOUVIER'S LAW DICTIONARY 920 (8th ed. 1914) ("If the term domicil can apply to corporations, they have their domicil wherever they are created[.]"). GHMSI's charter therefore instructs us to treat GHMSI as

---

[5] We express no view on whether the localization exception would apply here. That exception reflects the principle that "localization of activity within a particular state suffice[s] to make a federal corporation a citizen of that state." *Feuchtwanger Corp. v. Lake Hiawatha Fed. Credit Union*, 272 F.2d 453, 455 (3d Cir. 1959); *see also Loyola Fed. Sav. Bank v. Fickling*, 58 F.3d 603, 606 (11th Cir. 1995); 13F Wright & Miller's Federal Practice and Procedure § 3627 (3d ed. 2025).

incorporated in D.C. And, because all corporations are at least citizens of their states of incorporation for purposes of diversity jurisdiction, GHMSI is a D.C. citizen for such purposes. *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 188 (1990). That conclusion is reinforced by Congress's use of the phrase "*legal* domicile," which ordinarily confers "legal rights and privileges," *Domicile*, BLACK'S LAW DICTIONARY (6th ed. 1990) (emphasis added), such as the right to sue and be sued.

Several additional reasons support our conclusion that Congress meant its designation of domicile to have jurisdictional import. First, the Supreme Court has long used the term domicile to mean state of incorporation for purposes of diversity jurisdiction. Before § 1332(c)(1) defined corporate citizenship by statute, the Court explained that "members of the corporate body must be presumed to be citizens of the State *in which the corporation was domiciled*[.]" *Covington Drawbridge Co. v. Shepherd*, 61 U.S. 227, 233 (1857) (emphasis added). Later, it reaffirmed that "[b]y a conclusive presumption of law the stockholders of a corporation are deemed to be citizens of *the state of the corporation's domicil*." *Doctor v. Harrington*, 196 U.S. 579, 585 (1905) (emphasis added). The Court later noted the longstanding nature of that understanding, explaining that "[f]or almost a century, in ascertaining whether there is the requisite diversity of citizenship to confer jurisdiction on the federal courts, we have looked to *the domicile of a corporation*, not that of its individual stockholders, as controlling." *Puerto Rico v. Russell & Co.*, 288 U.S. 476, 479 (1933) (emphasis added). Similarly, in the context of the federal venue statutes, the Supreme Court has explained that "domicile, . . . in

11

respect of corporations, mean[s] the state of incorporation[.]" *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957); *see also Suttle v. Reich Bros. Constr. Co.*, 333 U.S. 163, 166 (1948); *Shaw v. Quincy Mining Co.*, 145 U.S. 444, 450 (1892).

While § 1332(c)(1) added a new basis for corporate citizenship—principal place of business—it did not eliminate or alter the settled rule that a corporation is a citizen of the state in which it was incorporated. That is, § 1332(c)(1) established that a corporation is "a citizen *not only* of its State of incorporation *but also* of the State where it has its principal place of business." *Carden*, 494 U.S. at 196 (quotation marks omitted and emphasis added). It "presuppose[d] the existence of a first thing (incorporation by at least one State) to which a second thing [was] then added (that corporation's State of principal place of business)[.]" *Schneiderman*, 172 F.4th at 184. Thus, a corporation not subject to § 1332(c)(1), like GHMSI, has the citizenship of its state of incorporation, just like all corporations did before § 1332(c)(1).

Second, Congress amended GHMSI's charter in light of decades of judicial practice treating domicile and citizenship as coterminous for purposes of diversity jurisdiction. *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 318 (2006). In such cases, we and our sister circuits have bluntly stated that "[t]he term 'citizen,' as used in the Judiciary Act with reference to the jurisdiction of the federal courts, is substantially synonymous with the term 'domicile.'" *Delaware, L. & W.R. Co. v. Petrowsky*, 250 F. 554, 557 (2d Cir. 1918); *accord Freeman v. Nw. Acceptance Corp.*, 754 F.2d 553, 555 (5th Cir. 1985); *Julien v. Sarkes Tarzian, Inc.*, 352 F.2d 845, 846 (7th Cir. 1965); *Kaiser v. Loomis*, 391 F.2d

12

1007, 1009 (6th Cir. 1968); *Steidle v. Reading Co.*, 24 F.2d 299, 301 (3d Cir. 1928). While such cases typically involve individuals, not corporations, they purport to define "citizenship" and "domicile" without any explicit qualification. To the contrary, many of the cases simply equate the two concepts "for purposes of federal jurisdiction" writ large. *See, e.g., Eckerberg v. Inter-State Studio & Publ'g Co.*, 860 F.3d 1079, 1086 (8th Cir. 2017).

Those cases are the legal backdrop against which Congress enacted GHMSI's amended charter in 1993. "Where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Evans v. United States*, 504 U.S. 255, 259 (1992) (citation modified). Given over a century of judicial practice using citizenship and domicile interchangeably, we are reluctant to assume that Congress intended to silently depart from that practice. Rather, Congress likely would have made its intentions clear had it meant to adopt a more limited interpretation of domicile.

Third, the legislative history makes clear that Congress's objective in the 1993 amendments was to broadly treat GHMSI like any other D.C. corporation, thereby "making permanent the authority of the District of Columbia over [GHMSI]." 139 CONG. REC. H8210-02, H8217 (daily ed. Oct. 20, 1993) (statement of Rep. Stark), 1993 WL 420315; *see also* 139 CONG. REC. S9507-01, S9509 (daily ed. July 27, 1993) (statement of Sen. Nunn), 1993 WL 280855 (the 1993

13

amendments "require[] that [GHMSI] be licensed in, and regulated by, the laws and regulations of the District of Columbia"). Accordingly the amendments made two, distinct changes to GHMSI's charter: they "establishe[d] the District of Columbia as the legal domicile of GHMSI *and* ensure[d] its regulation in accordance with the laws and regulations of the District of Columbia." 139 CONG. REC. at H8217 (emphasis added). Because Congress explicitly made both changes, the designation of domicile must have accomplished more than merely expanding the powers of D.C. insurance regulators. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024). Furthermore, Congress chose to locate the designation of domicile in a jurisdictional section of GHMSI's charter, rather than in the section of the charter pertaining to insurance regulation. Namely, Congress placed the designation of domicile in Section 1 of the charter, which also provides—in the immediately preceding sentence—that GHMSI may "sue and be sued . . . in any court of law or equity of competent jurisdiction[.]" 53 Stat. at 1412; *see also* 107 Stat. at 1349. In contrast, Congress placed the expansion of D.C.'s regulatory authority in Section 5 of the charter, which governs GHMSI's relationship with the "superintendent of insurance." 53 Stat. at 1413–14; *see also* 107 Stat. at 1349. Had Congress not wanted the designation of "legal domicile" to have jurisdictional effects, it would have made much more sense to put all of this amended language in Section 5 rather than directly after a jurisdictional sentence in Section 1.

While GHMSI's charter omits the words "jurisdiction" and "citizenship," there is no specific formula that Congress must use in order to expand diversity jurisdiction. "Congress need not use magic

words in order to speak clearly" as long as a jurisdictional statute "speak[s] in jurisdictional terms[.]" *Mid-New York Env't & Sustainability Promotion Comm., Inc. v. Dragon Springs Buddhist, Inc.*, 152 F.4th 413, 422 (2d Cir. 2025) (citation modified). Here, given the longstanding linkage of domicile and citizenship, we think that GHMSI's charter, "fairly read," confers diversity jurisdiction in this case. *City of New York v. Exxon Mobil Corp.*, 154 F.4th 36, 41 (2d Cir. 2025) (quotation marks omitted).

Finally, GHMSI's charter has jurisdictional import even without a more explicit reference to diversity jurisdiction. True, Congress has in some other statutory carveouts included language like "for purposes of . . . jurisdiction[.]" *Schneiderman*, 172 F.4th at 180 (quoting 20 U.S.C. § 1087-2(b)(1)). But that kind of qualifier would serve no discernible purpose in GHMSI's charter. Such language ordinarily serves as a "limitation[] on [a statutory section's] applicability." *Bd. of Trs. of Bakery Drivers Loc. 550 & Indus. Pension Fund v. Pension Benefit Guar. Corp.*, 136 F.4th 26, 31 (2d Cir. 2025). But given Congress's desire to treat GHMSI like any other D.C. corporation, there was no reason for Congress to so limit its designation of GHMSI's domicile. Unlike many other federally chartered corporations, GHMSI's operations are predominantly centered on D.C., it is registered and regulated in D.C., and its headquarters is in D.C. Because a designation of D.C. domicile makes sense for GHMSI in many respects, Congress used broad, unqualified language. We decline to limit the designation's scope after the fact.

In sum, GHMSI's charter specifies that its domicile, meaning place of incorporation, is D.C. Because a corporation not subject to

§ 1332(c)(1) has the citizenship of its place of incorporation, GHMSI is a D.C. citizen for jurisdictional purposes. There are thus no stateless parties in this case and our exercise of diversity jurisdiction is proper.

## II. Personal Jurisdiction

Because "a court without [personal] jurisdiction lacks power to dismiss a complaint for failure to state a claim," "logic compel[s]" us to address Defendants' jurisdictional objections before reaching the merits. *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963). Federal Rule of Civil Procedure 4(k)(1)(A) allows a federal court to exercise personal jurisdiction when authorized by the law of the state in which it sits and consistent with constitutional due process principles. *See Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 639 (2d Cir. 2023). The state requirements here come from New York's long-arm statute; the constitutional requirements come from the Due Process Clause of the Fourteenth Amendment. We address each in turn.

### A. New York Law

N.Y. C.P.L.R. § 302(a)(1), New York's long-arm statute, confers jurisdiction over claims "arising from" the acts of "any non-domiciliary . . . who in person or through an agent[] transacts any business within the state or contracts anywhere to supply goods or services in the state[.]" Northwell invokes only the "transacts any business" clause, not the "contracts anywhere" clause. Northwell must therefore allege the existence of a business transaction, as well as an "articulable nexus or substantial relationship between" the transaction and its claims. *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 340 (2012) (*Licci II*).

16

"[T]he overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York." *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007) (citation modified). "[T]he touchstone for jurisdiction under New York's long-arm statute," then, "is the intent to reach the forum[.]" *Spetner*, 70 F.4th at 640. An act is purposeful or intentional if it was undertaken to invoke the "benefits and protections of [New York's] laws." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (quotation marks omitted). One way that a defendant can avail itself of New York's laws is by engaging in "market activity" in New York. *Id.* at 382 (quoting *Mayes v. Leipziger*, 674 F.2d 178, 184 (2d Cir. 1982)).

For over a decade, Defendants maintained a close business relationship with a New York company (Empire) so that their customers could access healthcare from New York providers (including Northwell). Defendants received claims in a standardized format from Empire, relayed claim determinations back to Empire, and relied on Empire to facilitate the transmission of reimbursements to New York providers. Because of Defendants' relationship with Empire, Defendants' insureds were covered by Empire's provider agreements, allowing them to receive care in New York without paying higher out-of-network prices. That in turn enhanced the value of Defendants' product, predictably resulting in numerous New York residents obtaining their coverage from Defendants, including most of the patients whose bills are at issue here. Moreover, Defendants' relationships with Empire were reciprocal, with Defendants providing the same services to Empire when Empire's insureds

17

sought care in Defendants' areas of operation.

These allegations show that Defendants "purposefully sought to establish a substantial ongoing business relationship" with Empire, and thus "demonstrate a clear intent by [Defendants] to engage purposefully in business activities within the meaning of CPLR 302(a)(1)." *State v. Vayu, Inc.*, 39 N.Y.3d 330, 334 (2023). Even isolated acts that might not otherwise give rise to jurisdiction can do so when they are "part of a far reaching and long-standing relationship," *id.* at 336, or "result[] in the purposeful creation of a continuing relationship" with a New York entity, *D & R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 298 (2017) (quotation marks omitted).

There is also clearly an "articulable nexus" between that business relationship and Northwell's allegations. "[C]ausation is not required," and the nexus inquiry is "relatively permissive." *Licci II*, 20 N.Y.3d at 339. Northwell's central allegation is that Defendants prevented Empire from fully reimbursing Northwell. That could only occur because of the intermediary role that Empire had agreed to play in Defendants' claims processing regime. Northwell's claims are thus not "completely unmoored" from Defendants' contacts with the forum. *Id.*

Defendants raise several objections, none of which persuade us. First, Defendants emphasize that they have not contracted directly with a New York entity. But neither we nor the Court of Appeals has ever approached the purposeful availment inquiry in such a rigid, formalistic manner.

Our cases concerning correspondent bank accounts are

18

instructive.  There, we have noted two relevant principles.  On one hand, "the existence of a correspondent account in New York, without more, does not subject a defendant foreign bank to long-arm jurisdiction."  *Spetner*, 70 F.4th at 639–40.  Conversely, "a defendant foreign bank's repeated *use* of a correspondent account in New York on behalf of a client—in effect, a course of dealing—*can* constitute transacting business for purposes of § 302(a)(1), even if the defendant has no other contacts with the forum."  *Id.* at 640 (quotation marks omitted and emphasis in original).  And "use" of the in-state bank account can suffice even where the foreign bank does not formally "own" the in-state account, since the foreign bank's "choice to project itself into New York can be evident through the selection and repeated use of an agent's correspondent account in the forum."  *Id.* Thus, on the one hand, the mere existence of a corresponding banking relationship is not always enough to generate personal jurisdiction. On the other hand, an intentional course of dealing using a correspondent bank account may generate jurisdiction even if structured informally.

Here, Defendants' overall "course of dealing" evinces an unmistakable intent to exploit the New York market for healthcare. For example, Defendants and Empire all signed license agreements with BCBSA that commit them to "effectively and efficiently participate in [the BlueCard Program] for the purposes of providing portability of membership between the Plans and ease of claims processing for customers receiving benefits outside of the Plan's Service Area."  Joint App'x at 17.  That is, Defendants contracted with BCBSA for the express purpose of allowing their insureds to access

19

healthcare in New York, which is "outside of [Defendants'] Service Area[s]." *Id.*

The fact that Defendants' commitments were mediated through license agreements with BCBSA is beside the point. The key is that the license agreements impose obligations on Defendants in order to allow Defendants to access New York markets. Section 302(a) does not separately require Defendants to execute a direct contract with a New York entity. Nor does Northwell "need to establish a formal agency relationship in order to attribute the actions of the agent [Empire] to the principal [Defendants]," as "agency within the meaning of § 302(a) is given a broad interpretation." *Spetner*, 70 F.4th at 640 (citation modified). All Northwell must show is that "the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Id.* Here, Northwell easily clears that bar by alleging that Empire processed payments on behalf of Defendants, that Defendants retained control over the timing and amounts of such payments, and that Defendants benefitted from Empire's access to preferential prices as a result of the arrangement.

Next, Defendants emphasize that they do not actively solicit New York customers, do not advertise or sell insurance plans in New York, are not regulated as New York insurers, and do not offer group insurance plans to employers headquartered in New York. But even so, they have created and marketed an insurance product designed to appeal to individuals who anticipate obtaining care in New York. Because of Defendants' relationship with Empire, Defendants' insureds are charged more predictable in-network rates in New York.

They also benefit from a streamlined claims processing mechanism only available for in-network care. BCBSA's own documentation recognizes "portability of membership" across states as a "unique premise[] and promise," and "one of the most important benefits of the most trusted healthcare network in America[.]" Joint App'x at 17–18. That documentation also belies Defendants' self-serving assertion that their network is somehow independent of Empire's network. Rather, it emphasizes that the BlueCard Program "links . . . independent Blue Cross Blue Shield companies . . . in a *single* electronic network[.]" *Id.* at 18 (emphasis added). Those facts suffice to establish a prima facie case that Defendants' connection to New York is more than "coincidental" and, on this posture, we do not accept naked assertions to the contrary. *Licci II*, 20 N.Y.3d at 338; *see also Porina*, 521 F.3d at 126. Furthermore, Defendants' subjective intentions would be irrelevant on any procedural posture, because purposefulness under § 302(a)(1) "is an objective inquiry" that asks only if the "defendant, through volitional acts, avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323 (2016) (quotation marks omitted).

Third, Defendants object that their insureds obtained care in New York unilaterally, and that a third party's unilateral acts are not jurisdictionally relevant contacts. The complaint does not specify how or when the insureds here became New York residents, but Defendants suggest that it was after they initially obtained their insurance coverage. Regardless, as explained above, it is the insureds' residency alongside Defendants' own extensive collaboration with

21

Empire that permits the inference of intentional access to New York's markets. Focusing on the combination also helps illustrate why Defendants' citations to cases about automotive insurance are inapposite. *See* Appellees' Br. at 24 (citing *Hunt v. Erie Ins. Grp.*, 728 F.2d 1244 (9th Cir. 1984)). If an auto insurer provides nationwide coverage, it is purely the driver's conduct that links the insurer to the state where the accident occurs. The insurer in *Hunt*, for example, had taken no steps to make it easier or less costly for its customers to obtain benefits in the forum state. And there was nothing in *Hunt* akin to the Blue Cross network. The Ninth Circuit in *Hunt* merely rejected the extreme notion that an insurer is liable to suit in any state that it fails to expressly exclude from its coverage. *Hunt*, 728 F.2d at 1246–48.[6] Here, in contrast, Defendants' coverage of New York residents stems from Defendants' intentional efforts to serve the New York market by developing a business relationship with a New York company.

Lastly, Defendants point to a collection of lower court cases (and one case from the Fifth Circuit) declining personal jurisdiction over out-of-state Blue Cross licensees or similar entities. Because those cases concern the constitutional due process constraints on personal jurisdiction, we address them in the next section.

In sum, Defendants transacted business in New York and Northwell's claims arise from that business, bringing Defendants within the scope of New York's long-arm statute.

---

[6] *Hunt*, like all of Defendants' other cases on this point, concerns constitutional limits on personal jurisdiction, not New York's long-arm statute.

## B. Due Process

Due process requires sufficient contacts with the forum state such that "the maintenance of the suit" is "reasonable, in the context of our federal system of government," and "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316–17 (1945) (quotation marks omitted). If, as here, the plaintiff invokes specific jurisdiction, the necessary contacts "often go by the name purposeful availment." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (quotation marks omitted). The doctrine is animated by "two sets of values—treating defendants fairly and protecting 'interstate federalism.'" *Id.* at 360 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980)). In service of the former, defendants are entitled to "fair warning" that their conduct subjects them to a state's jurisdiction, and "reciprocity," in the sense that jurisdiction arises when a company "exercises the privilege of conducting activities within a state—thus enjoying the benefits and protection of its laws[.]" *Id.* (citation modified). In service of the latter, conduct must not be so trivial that "States with 'little legitimate interest' in a suit . . . encroach on States more affected by the controversy." *Id.* (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 263 (2017)).

Although New York law may confer personal jurisdiction where the Constitution does not, the state and federal analyses can sometimes be virtually identical. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* (*Licci III*), 732 F.3d 161, 170 (2d Cir. 2013). That is largely true in this case. The same facts that support a finding of

purposeful availment under state law likewise show that each defendant has "take[n] 'some act by which it purposefully avails itself of the privilege of conducting activities within the forum State.'" *Ford Motor Co.*, 592 U.S. at 359 (alteration adopted) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Just like under New York law, purposeful availment for constitutional purposes can involve "'exploiting a market' in the forum state," since "when a corporation has 'continuously and deliberately exploited a State's market, it must reasonably anticipate being haled into that State's courts[.]'" *Id.* at 359, 364 (alterations adopted) (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014) and *World-Wide Volkswagen*, 465 U.S. at 781).

Thus, while we are obliged to conduct "a separate constitutional analysis," *Licci III*, 732 F.3d at 170, we see no need to repeat our assessment of the facts from the previous section of this Opinion. *See, e.g.*, *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) ("We conclude that [the] assertion of personal jurisdiction . . . comports with due process for the same reasons that it satisfies New York's long-arm statute.").[7] We instead focus on addressing those of Defendants' arguments that we understand to

---

[7] Beyond purposeful availment, we must also ensure that the exercise of jurisdiction is reasonable under the Due Process Clause. *See Am. Girl, LLC v. Zembrka*, 118 F.4th 271, 279 (2d Cir. 2024). Given the strength of the contacts at issue, this is not an "exceptional situation" in which we might find the exercise of specific personal jurisdiction to be "unreasonable" once purposeful availment has been established. *See In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 274 (2d Cir. 2023) (quotation marks omitted).

sound in a constitutional register.

First, Defendants argue that merely providing nationwide insurance coverage cannot confer jurisdiction, in part because doing so would subject every insurer to lawsuits in every state. But, as explained above, Defendants' relationship with Empire amounted to more than just nationwide coverage. And Defendants cannot shield themselves from the courts of one state simply by targeting other states, too. As *Ford Motor Co.* made clear, a business that directs conduct toward every state may in certain circumstances be subject to specific personal jurisdiction in every state without offending the Constitution. 592 U.S. at 355. If contacts "arise[] from [Defendants'] efforts . . . to serve, directly or indirectly, the market for its product in several or all other States, it is not unreasonable to subject [Defendants] to suit in one of those States[.]" *Id.* at 363 (quotation marks omitted and alteration adopted). The fact that Defendants targeted New York "among other States" does not negate the purposeful nature of that targeting. *Id.*

Second, defendants identify a number of district court cases declining personal jurisdiction over out-of-state Blue Cross licensees. *See* Appellees' Br. at 26–28 (collecting cases). We do not find these cases persuasive. Most merely adopt or restate the conclusion from one Texas district court case, *St. Luke's*, which relied almost entirely on the lack of a contract between the parties to conclude that the BlueCard Program was an insufficient basis for jurisdiction. *See St. Luke's Episcopal Hosp. v. La. Health Serv. and Indem. Co.*, No. 08-CV-1870, 2009 WL 47125, at *7–10 (S.D. Tex. Jan. 6, 2009); *see also, e.g.*, *Craig Hosp. v. Empire Healthchoice, Inc.*, No. 18-CV-00794, 2019 WL 10258608,

at *5 (D. Colo. Apr. 1, 2019) (adopting *St. Luke's*); *Stanford Health Care v. Haw. Med. Serv. Ass'n*, No. 21-CV-06720, 2022 WL 4021759, at *3 (N.D. Cal. Sep. 2, 2022) (similar).  These cases ignore the role that in-forum Blue Cross licensees play in the BlueCard Program, as well as the reciprocal nature of the Program's structure.  And while the Ninth Circuit has summarily affirmed a case declining personal jurisdiction over out-of-forum Blue Cross companies, its opinion is not precedential and does not discuss the BlueCard Program, nor did plaintiffs in that case identify the BlueCard Program as a basis for jurisdiction.  *See Healthcare Ally Mgmt. of Cal., LLC v. Blue Cross Blue Shield of Minn.*, 787 F. App'x 417, 418 (9th Cir. 2019).

Finally, Defendants point to the Fifth Circuit's opinion in *Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364, 369 (5th Cir. 2010), which they claim requires a conclusion different from the one we reach here.  We are of course not bound to follow the Fifth Circuit's reasoning, but we also find *Choice Healthcare* distinguishable in several respects.  Most importantly, there was no in-forum entity analogous to Empire.  Rather, the insurer and healthcare provider in *Choice Healthcare* separately contracted with a third party "preferred provider organization" that was not based in the forum state and had no in-forum presence.  *Id.* at 366–67.[8]  The defendant in *Choice Healthcare* also actively limited its insureds' access to care outside of its home state, directing them to in-state providers and covering only

---

[8] The appellees' brief in *Choice Healthcare* clarifies that the preferred provider organization was based in New York, an unrelated third state.  *See* Original Brief of Defendants/Appellees, *Choice Healthcare*, 2010 WL 1177361, at *27.

"limited [out-of-state] treatment . . . based on emergency care or other urgent health care needs." *Id.* at 370. The opposite is true here, where Defendants even provided resources to help their insureds find and obtain care from New York providers, including Northwell. And none of the patients in *Choice Healthcare* lived in the forum state, *id.*, whereas most of the charges here were incurred by New York residents. Given these differences, we view the Fifth Circuit's approval of the district court opinion in *St. Luke's* to be at most dicta with respect to Blue Cross and the BlueCard Program. To the extent the Fifth Circuit's approval of *St. Luke's* suggests that the court did not believe these distinctions to be important, we disagree.

In sum, we conclude that Northwell has pled sufficient contacts between Defendants and New York to satisfy the Constitution's minimum requirements for specific jurisdiction.

## III.     Contract Claims

Because Defendants are not parties to the Provider Agreement, Northwell's contract claims fail unless they fit under one of New York's exceptions to the general rule that "the terms of a contract may be enforced only by contracting parties or intended third-party beneficiaries of the contract." *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014). Northwell articulates several theories for why Defendants are liable, including that Empire acted as Defendants' actual or apparent agent, that Defendants manifested their intent to be bound by the Provider Agreement, and that Defendants ratified the Provider Agreement. We conclude that Northwell's ratification theory is adequately pled and therefore

27

reverse.

Under New York law, "[r]atification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 691 (2d Cir. 2011) (quoting 57 N.Y. Jur. 2d *Estoppel, Ratification, and Waiver* § 87). "Ratification may be express or implied, or may result from silence or inaction." *Id.* (alteration adopted) (quoting 57 N.Y. Jur. 2d *Estoppel, Ratification, and Waiver* § 88); *accord Standard Funding Corp. v. Lewitt*, 89 N.Y.2d 546, 552 (1997). "A party may ratify a contract . . . by intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 123 (2d Cir. 2001) (quotation marks omitted), *abrogated on other grounds by Slayton v. Am. Express Co.*, 460 F.3d 215, 228 & n.13 (2d Cir. 2006); *accord Allen v. Riese Org., Inc.*, 965 N.Y.S.2d 437, 440 (1st Dep't 2013).

Whereas an ordinary agency relationship requires a showing of either actual or apparent authority, *Ryniker v. Sumec Textile Co. Ltd.*, 177 F.4th 365, 377–78 (2d Cir. 2026), establishment of an agency relationship via ratification does not, *Hewett v. Marine Midland Bank of Se. N. Y., N. A.*, 449 N.Y.S.2d 745, 751 (2d Dep't 1982). Rather, "[e]ven if there were no actual or apparent authority . . . [i]f the principal accepts the benefits of its agent's misdeeds, with actual or imputed knowledge, it ratifies the agent's action." *Id.*; *see also Cologne Life Reinsurance Co. v. Zurich Reinsurance (N. Am.), Inc.*, 730 N.Y.S.2d 61, 68 (1st Dep't 2001) (same).

Accepting for purposes of argument that Defendants never communicated to either Empire or Northwell an intent to be bound by Empire's actions, Northwell adequately pled that Defendants later ratified Empire's signing of the Provider Agreement by performing and accepting benefits under it. Defendants allegedly performed under the Northwell-Empire Provider Agreement for decades, "determin[ing] claims according to a . . . procedure that was set forth in the Provider Agreement," "grant[ing] and pa[ying] claims . . . consistent with the terms of the Provider Agreement in many ways," and "instruct[ing] [their] insureds to present their insurance cards to out-of-state BlueCard providers." Appellant's Br. at 25–26. Defendants also allegedly "reap[ed] the benefits of discounted, in-network rates," rather than the higher rates Northwell would otherwise charge. Appellant's Reply Br. at 20. Furthermore, because Northwell treated at least some of Defendants' insureds in emergency rooms, it could not have refused to provide care, meaning that Defendants would have paid higher out-of-network prices but for the Provider Agreement.

Substantively, Defendants' only response to this theory of liability is that "the [Provider] Agreement does not provide Defendants themselves with benefits, thus there could be no ratification[.]" Appellees' Br. at 47–48. With no further explanation, defendants then cross-reference their response to Northwell's quasi-contract claim, suggesting that ratification requires a direct rather than indirect acceptance of benefits. But Defendants identify no authority for applying that principle in the ratification context. They also overstate the principle in the quasi-contract context. *See infra*

29

Section IV.   And Defendants concede that the arrangement did provide them with indirect benefits by making their insurance products more valuable for their insureds.   In any event, this argument addresses only ratification via acceptance of benefits and ignores Defendants' long-term knowledge of and performance under the Provider Agreement.

Defendants' answers to Northwell's other theories of contract liability, while better supported, are unresponsive.   For example, Defendants argue that manifestation of intent to be bound by an unsigned contract "must be apparent from . . . 'expressed words and deeds[.]'"  Appellees' Br. at 39 (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399 (1977)).   But, while that is true for a manifestation-of-intent theory of liability, ratification may be implied and based on imputed knowledge.  *See Standard Funding Corp.*, 89 N.Y.2d at 552; *Hewett*, 449 N.Y.S.2d at 751.

Defendants also invoke forfeiture, arguing that Northwell failed to present its ratification theory below.   But our forfeiture doctrine is "prudential, not jurisdictional," and "we have discretion to consider [forfeited] arguments."  *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006) (quotation marks omitted).   We have exercised that discretion to "entertain arguments not raised in the trial court if the elements of the claim were fully set forth and there is no need for additional fact finding."  *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994).  Here, while Northwell concededly did not label its arguments as "ratification" in the district court, it presented largely the same theory under the header "Defendants assumed the BlueCard terms and manifested their intent to be bound."   Opposition to

30

Motion to Dismiss at 24, *Northwell Health, Inc. v. Grp. Hospitalization & Med. Servs., Inc.*, No. 23-CV-01268, 2024 WL 5213366 (E.D.N.Y. Dec. 24, 2024), Dkt. No. 25. Northwell argued that Defendants assumed obligations under the contract, repeatedly accepted benefits under it, performed under it by determining amounts due on claims, and never disavowed it. *Id.* We believe that is sufficient and therefore excuse Northwell's failure to accurately label its legal theory below.

Because we conclude that Northwell has adequately pled a ratification theory, we need not reach, and express no view on, its agency and manifestation-of-intent theories of liability.

## IV.     Quasi-Contract Claims

Northwell also argues that the district court erred in dismissing its quasi-contract claims as duplicative. We agree.

Under New York law, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987). Thus, a plaintiff may not "seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Id.* at 389. Like the New York Court of Appeals, we have generally limited the bar on quasi-contract actions to situations where "*the parties* have a valid, enforceable contract that governs the *same subject matter*[.]" *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005)

31

(emphases added); *see also Rynasko v. N.Y. Univ.*, 63 F.4th 186, 201 (2d Cir. 2023) (similar).

That rule reflects the notion that "the parties' own definition of their respective obligations . . . take[s] precedence over the obligations that the law would impose in the absence of agreement." Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. c (2011). It also helps prevent "duplicative relief" once a party has secured a remedy for breach of contract. *See Mid-Hudson Catskill Rural Migrant Ministry*, 418 F.3d at 177. There is, however, no categorical bar on quasi-contract claims whenever a contract is involved in the underlying dispute, and New York courts have repeatedly allowed such claims to proceed. *See, e.g., Bradkin v. Leverton*, 26 N.Y.2d 192, 198–99 (1970) (allowing a quasi-contract claim against an individual officer of a corporation despite the existence of a written contract between the plaintiff and the corporation); *see also Georgia Malone & Co. v. Ralph Rieder*, 926 N.Y.S.2d 494, 496–98 (1st Dep't 2011) (similar), *aff'd,* 19 N.Y.3d 511 (2012); *Manhattan Chrystie St. Dev. Fund, LLC v. 215 Chrystie Invs. LLC*, 212 N.Y.S.3d 598, 600 (1st Dep't 2024) (similar).

Here, the parties vigorously dispute whether the Provider Agreement covers Defendants' conduct with respect to approving and paying Northwell's claims. Defendants themselves argue that they "are not parties to the Agreement," and that "[t]he Agreement governs only the relationship between Northwell and Empire." Appellees' Br. at 42–43. And while Defendants argue that Northwell should seek recovery from Empire, Northwell counters that Empire is not responsible for the claims under "the Agreement's text." Appellant's Reply Br. at 14. It is therefore unclear from the pleadings

32

that "the scope of [the Provider Agreement] clearly covers the dispute between the parties," and dismissal was not warranted. *Clark-Fitzpatrick*, 70 N.Y.2d at 389.

This outcome makes sense in light of the nature of the quasi-contract remedy—"an obligation which the law creates in the absence of agreement when one party possesses money that in equity and good conscience he ought not to retain and that belongs to another." *Parsa v. State*, 64 N.Y.2d 143, 148 (1984). It rests upon "broad considerations of right, justice and morality," *id.*, and what must ultimately be established is that the transaction is "one of equitable injustice requiring a remedy to balance a wrong," *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 517 (2012) (quotation marks omitted). If Defendants are right that the Provider Agreement does not bind them and Northwell is right that it does not bind Empire, then Northwell would have no breach-of-contract claim at all. That is precisely when quasi-contract is designed to step in to prevent the harsh consequences that might otherwise arise.

We acknowledge that there has been disagreement among district courts in this Circuit as to the appropriate scope of *Clark-Fitzpatrick* and that the district court here reasonably followed one line of this authority. *Compare Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 207–08 (S.D.N.Y. 2016) (dismissing quasi-contract claim as duplicative), *with Lee v. Kylin Mgmt. LLC*, No. 17-CV-7249, 2019 WL 917097, at *3 (S.D.N.Y. Feb. 25, 2019) (allowing both claims to proceed). But we find unsupported the maximalist position that the mere existence of a contract pertaining to the same subject matter "bars any quasi-contractual claims against . . . a third party

33

nonsignatory[.]" *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 166 (E.D.N.Y. 2012) (quoting *Bellino Schwartz Padob Advert., Inc. v. Solaris Mktg. Grp.*, 635 N.Y.S.2d 587, 588 (1st Dep't 1995)). Indeed, the First Department has recently clarified that there is no "categorical rule" that a "plaintiff's claim is precluded by the existence of [an overlapping] [a]greement." *Manhattan Chrystie St. Dev. Fund*, 212 N.Y.S.3d at 600 (distinguishing *Bellino*).

Furthermore, the Federal Rules of Civil Procedure expressly authorize inconsistent pleading. *See* Fed. R. Civ. P. 8(d)(3); *see also Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95–96 (2d Cir. 1994). We have therefore allowed contract and quasi-contract claims to be pled in the alternative, even where recovery on both would be precluded. *See Rynasko*, 63 F.4th at 202.

Importantly, a plaintiff need not expressly allege in its complaint "a dispute over the existence, scope, or enforceability of the putative contract," against the interests of their contractual claim, in order to plead an alternative quasi-contract theory of liability. *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 263 (2d Cir. 1999). Such specificity is required when a plaintiff seeks to defer until after trial its right, under New York substantive law, "to rescind [a contract] and seek a *quantum meruit* remedy," *id.*, but is not required at the pleading stage. While Rule 8's authorization of inconsistent pleading is intended to protect a plaintiff who may "legitimately [be] in doubt about the factual background of the case or the legal bases that underlie affirmative recovery or defense," 5 Wright & Miller's Federal Practice & Procedure § 1283 (4th ed. 2026), it does not force a plaintiff to expressly plead facts undermining one theory in order to also

pursue an alternative theory. At the pleading stage, it is enough that the complaint alleges facts sufficient to state a quasi-contract claim, standing alone, regardless of whether the complaint also asserts a contract claim.

Defendants separately urge us to affirm on the alternative ground that Northwell has not alleged that a benefit was provided at Defendants' behests. Defendants do not argue on appeal that Northwell has failed to plead any of the other required elements.

Under New York law, "to recover under a theory of unjust enrichment, the plaintiff must show that the services were performed 'for the defendant,' and not at the 'behest of someone other than the defendant.'" *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.*, No. 23-8083, 2024 WL 4315128, at *4 (2d Cir. Sep. 27, 2024) (summary order) (emphasis omitted) (quoting *Kagan v. K-Tel Ent., Inc.*, 568 N.Y.S.2d 756, 757 (1st Dep't 1991)). We and New York courts have applied that rule on several occasions to dismiss quasi-contract claims against health insurers. *See, e.g.*, *id.*; *Da Silva Plastic & Reconstructive Surgery, P.C. v. UnitedHealthcare Ins. Co. of N.Y., Inc.*, 226 N.Y.S.3d 294, 296 (2d Dep't 2025); *Abira Med. Laby's, LLC v. Cigna Health & Life Ins. Co.*, No. 24-2837, 2025 WL 1443016, at *2 (2d Cir. May 20, 2025) (summary order) (applying Connecticut law). Northwell distinguishes these cases because, "[i]n each, the provider treated patients independently, with no allegation that the insurer directed the insured to the provider, processed claims, or invoked a nationwide program to secure discounted rates." Appellant's Reply Br. at 29. We agree. The plaintiffs in *Rowe*, *Abira*, and *Da Silva* were

all out-of-network with the defendant insurers.[9]  They alleged no specific promises to pay, nor any agreements as to negotiated rates, instead relying on the insurers' more general commitments to pay for medically necessary treatment.  *See, e.g., Da Silva Plastic & Reconstructive Surgery*, 226 N.Y.S.3d at 295.  Here, in contrast, Northwell alleges that it relied on promises in the Provider Agreement to pay specific rates for specific healthcare services, and that Defendants participated in the Blue Cross network to benefit from those negotiated rates.  Northwell also alleges that Defendants induced their insureds to seek out Northwell by providing resources to search for in-network providers in New York.

All that Northwell must show is "a connection between the parties that [is] not too attenuated."  *Georgia Malone & Co.*, 19 N.Y.3d at 517.  While "a plaintiff [may] satisfy this requirement by alleging

---

[9]  *See Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.*, 705 F. Supp. 3d 194, 198 (S.D.N.Y. 2023) ("Plaintiffs were out-of-network providers[.]"), *aff'd*, No. 23-8083, 2024 WL 4315128 (2d Cir. Sep. 27, 2024) (summary order); *Abria Med. Laby's, LLC v. Cigna Health & Life Ins. Co.*, No. 23-CV-830, 2024 WL 4349052, at *13 (D. Conn. Sep. 30, 2024) ("[Plaintiff] responds . . . by arguing that their state law claims do not relate to ERISA plans because . . . [no] ERISA plan provides reimbursement rates for the out-of-network services provided." (quotation marks omitted)), *aff'd sub nom., Abira Med. Labs., LLC v. Cigna Health & Life Ins. Co.*, No. 24-2837, 2025 WL 1443016 (2d Cir. May 20, 2025) (summary order); *Da Silva Plastic & Reconstructive Surgery*, 226 N.Y.S.3d at 295 ("[T]he plaintiff chose to remain an out-of-network provider[.]"); *see also Kirell v. Vytra Health Plans Long Island, Inc.*, 815 N.Y.S.2d 185, 186 (2d Dep't 2006) (dismissing an unjust enrichment claim brought against an insurer by a "non-participating provider").

that the benefit was conferred at the behest of the defendant, the Court of Appeals has never required such a relationship." *Philips Int'l Invs., LLC v. Pektor*, 982 N.Y.S.2d 98, 102–03 (1st Dep't 2014) (citation omitted). "Rather, the pleadings merely have to 'indicate a relationship between the parties that could have caused reliance or inducement.'" *Id.* (quoting *Georgia Malone & Co.*, 19 N.Y.3d at 517); *see also Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (articulating the same standard). Here, Northwell's allegations about the contracts, relationships between the parties, and nature of Defendants' BlueCard Program suffice.

We also note that Defendants' cases all involve non-emergency services. *Cf. Emergency Physician Servs. of N.Y. v. UnitedHealth Grp., Inc.*, 749 F. Supp. 3d 456, 472 (S.D.N.Y. 2024) ("New York courts have drawn a clear distinction between unjust enrichment cases involving emergency medical services, and those involving elective medical services." (quotation marks omitted)); *Manalapan Surgery Ctr., P.A. v. 1199 SEIU Nat'l Benefit Fund*, No. 23-CV-03525, 2025 WL 813610, at *9 (E.D.N.Y. Mar. 12, 2025) (same). Because neither party briefs this issue and it is unnecessary to resolve the appeal, we express no opinion on what rule applies when an unjust enrichment claim concerns medical services provided on an emergency basis, as at least some services were here.

## V.     Third-Party Beneficiary Claims

Northwell next argues that the district court erred in rejecting its third-party beneficiary theory of liability. It bases this theory on Defendants' license agreements with BCBSA, as well as unspecified

other agreements between Defendants, Empire, and other Blue Cross licensees.

In New York, third-party beneficiary liability requires "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for the third party's benefit and (3) that the benefit to the third party is sufficiently immediate, rather than incidental[.]" *Walton v. Comfort Sys. USA (Syracuse), Inc.*, 155 F.4th 144, 158 (2d Cir. 2025) (quotation marks omitted and alterations adopted). Such claims are limited to "two situations: when the third party is the only one who could recover for the breach of contract or when it is otherwise clear from the language of the contract that there was an intent to permit enforcement by the third party." *Dormitory Auth. v. Samson Constr. Co.*, 30 N.Y.3d 704, 710 (2018) (quotation marks omitted); *see also Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005).

The district court correctly dismissed these claims because Northwell has not identified language in the relevant agreements that, on its face, suggests that Northwell is an intended beneficiary. While perhaps the structure of the agreements assumes an important role for healthcare providers, Northwell has not alleged that they "contain any language evincing the parties' intent to authorize [Northwell] to enforce any obligations thereunder," nor is Northwell the only party that can enforce them. *See Old Crompond Rd., LLC v. County of Westchester*, 162 N.Y.S.3d 71, 74 (2d Dep't 2022). We thus affirm dismissal of Northwell's third-party beneficiary claims.

## VI.     Leave to Amend

Finally, Northwell challenges the district court's denial of post-judgment leave to amend, which we review for abuse of discretion. *See Mandala v. NTT Data, Inc.*, 88 F.4th 353, 359 (2d Cir. 2023); *Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 142 (2d Cir. 2020). Such leave may be denied when, *inter alia*, amendment would be futile. *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019). We are already reversing the dismissal of Northwell's contract and quasi-contract claims, making the request for leave moot as to those claims. And because Northwell proposed no specific additions to its complaint that would render its third-party beneficiary claims plausible, the district court did not abuse its discretion in denying the motion as futile. *See Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 55 (2d Cir. 2025) (concluding that the district court did not abuse its discretion where the defendant identified deficiencies in a premotion letter and plaintiff's request to amend did not identify any proposed amendments).

## CONCLUSION

For these reasons, we **AFFIRM** in part the district court's judgment as to the third-party beneficiary claims and its denial of leave to amend. We otherwise **REVERSE** the district court's judgment and **REMAND** to the district court for further proceedings.